Argued and submitted June 6, reversed and remanded August 30, 2006

CITIZENS FOR RESPONSIBILITY,
an unincorporated association,
Philip Ziebert, Adam Novick, and Maureen Hudson,
*Respondents,*

*v.*

LANE COUNTY,
*Petitioner.*

2005-082; A132091

142 P3d 486

Stephen L. Vorhes argued the cause for petitioner. With him on the brief was Lane County Office of Legal Counsel.

Daniel J. Stotter argued the cause for respondents. With him on the brief was Bromley Newton LLP.

Before Linder, Presiding Judge, and Wollheim, Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

**DEITS, J. pro tempore**

Lane County seeks review of a Land Use Board of Appeals (LUBA) decision remanding the county's approval of a special use permit for a firearms training facility for further proceedings consistent with LUBA's understanding of ORS 197.770. We reverse and remand LUBA's decision.

■ Before addressing the merits of the county's challenge to LUBA's decision, we consider whether the county has standing to bring this review proceeding. If the county lacks standing to seek review, this court does not have jurisdiction to review LUBA's decision. As we held in *Utsey v. Coos County*, 176 Or App 524, 546-47, 32 P3d 933 (2001), *rev dismissed*, 335 Or 217 (2003), any party seeking review under ORS 197.850 of a decision by LUBA must satisfy the constitutional requirement that our decision will "have a practical effect" on the party. Accordingly, the county must demonstrate a practical effect on its interests in order to establish standing to bring this appeal.

■ The county's petition for judicial review alleges that "a decision of this court will have a practical effect on the interests of petitioner by determining the meaning of the applicable law and the scope of any further county proceedings, if required." That statement, by itself, does not necessarily answer the question of standing here. The same could be said of many court decisions. As the Oregon Supreme Court recently reiterated in its decision in *MacPherson v. DAS*, 340 Or 117, 134, 130 P3d 308 (2006), governmental entities perform multiple functions; they are not solely legislative, executive, or judicial. Whether a governmental entity has standing to seek judicial review of a judicial or quasi-judicial decision will depend on the particular functions that the governmental entity is exercising in the case.

The Oregon Supreme Court considered an analogous issue in *Valley & Siletz Railroad v. Laudahl*, 296 Or 779, 681 P2d 109 (1984), in which LUBA sought review of a decision of this court. In that case, the court held that LUBA had not demonstrated the statutorily required adverse affect or aggrievement that was necessary to invoke the court's jurisdiction. The court explained:

"LUBA's role in policy development is no greater than that of any quasi-judicial body which applies the law to factual settings consistently and over a period of time in its area of specialty. Certainly, land use regulation is a matter of statewide public interest, but this alone does not render every agency involved in land use regulation, for instance a local planning commission, 'aggrieved' when it is dissatisfied with a judicial ruling. The role delegated to the agency apart from its use of quasi-judicial procedures is the controlling consideration. We find no indication in the duties delegated to LUBA that the legislature contemplated that the tribunal would assume the role of advocate. Both enforcement and primary policy making responsibility reside in the Department and the Commission. LUBA's 'statutorily defined interest or responsibility,' *Ochoco Const. v. DLCD*, [295 Or 422,] 433[, 667 P2d 499 (1983)], lies in impartial, consistent and speedy review of local land use decisions. Having no statutory interest beyond this, LUBA cannot be aggrieved by a reversal of its order on appeal."

*Id.* at 788.

■ The county's functions here involve the application and interpretation of county land use regulations relating to ORS 197.770.[1] The county's review of the permit application at issue here is, of course, quasi-judicial in nature. However, the county's exercise of this quasi-judicial authority is inextricably intertwined with its legislative and executive responsibilities to adopt and implement county policies and regulations that carry out the statutory directives. For example, implementation of the statutory requirements involves decisions concerning the allocation of county staff and

---

[1] ORS 197.770 provides:

"(1) Any firearms training facility in existence on September 9, 1995, shall be allowed to continue operating until such time as the facility is no longer used as a firearms training facility.

"(2) For purposes of this section, a 'firearms training facility' is an indoor or outdoor facility that provides training courses and issues certifications required:

"(a) For law enforcement personnel;

"(b) By the State Department of Fish and Wildlife; or

"(c) By nationally recognized programs that promote shooting matches, target shooting and safety."

governing body time and the expenditure of county funds, which the county is required to appropriate from limited resources, as well as other local policy decisions relating to this particular type of use.

This difference is significant because, in contrast to the circumstances in *Valley & Siletz Railroad*, where LUBA was acting solely in an adjudicative capacity, the county here was exercising both legislative and executive functions in addition to its adjudicative function. Whether sufficient practical effects have been demonstrated to establish standing by a governmental entity to seek review of a judicial or quasi-judicial decision will depend to a great degree on the particular circumstances of a case. Based on the circumstances here, however, we conclude that the county has shown sufficient impact on its interests to establish standing to bring this review proceeding. Accordingly, we proceed to the merits.

The permit that is the subject of this appeal was sought by the property owner, the Izaak Walton League (the League). The League has operated a gun club on the property, which consists of 17 acres, since the mid-1950s. The property was once zoned AGT (Agriculture, Grazing, Timber). That zone did not expressly allow shooting ranges but allowed authorization of such uses by means of a conditional use permit. In 1975, the League obtained a conditional use permit to facilitate the expansion of the facility, apparently to include a skeet shooting range.[2] Subsequently, the property was rezoned "F-2," which, under the provisions of the county code for that zone, allows a firearms training facility "that shall not significantly conflict with the existing uses on adjacent and nearby lands" under Lane Code (LC) 16.211(3)(c-c). Since the time of the rezoning, a number of changes have been made to the operation of the facility.

The League applied for the permit at issue here in 2003. It asked for *post hoc* approval of modifications made to the facility after 1975. In its request, the League relied on the

---

[2] The conditional use permit required a three-year review to ensure compatibility with the neighborhood, limited the allowed uses to the recreational shooting of rifles, shotguns, and handguns, and placed a limit on development and improvements.

provisions of ORS 197.770 that allow firearms training facilities in existence on September 9, 1995, to continue until such time as the facility is no longer used as a firearms training facility. The League asserted that the modifications made before the effective date of the statute would not need to be evaluated under LC 16.211(3)(c-c) to determine whether the uses "significantly conflict with the existing uses on adjacent and nearby lands."

The county planning director conducted a hearing on the permit application in April 2004. The planning director agreed with the League that, as of September 9, 1995, the facility qualified as a "firearms training facility" under ORS 197.770(2). The planning director reached that conclusion based on his determination that, before September 9, 1995, the facility provided training courses and issued certifications required by nationally recognized programs that promote shooting matches, target shooting, and safety. Consequently, the planning director evaluated only the modifications made to the facility after September 9, 1995, under LC 16.211(3)(c-c) to determine whether the facility conflicts with existing uses on adjacent and nearby lands. The planning director found that the modifications made after September 9, 1995, did not conflict with existing adjacent uses and approved the application.

Citizens For Responsibility, Novick, Ziebert, and Hudson (Citizens) appealed the planning director's decision to the county hearings officer. Citizens argued to the hearings officer that there was no evidence that the facility provided training courses and certifications after 1995. It was Citizens' position that, for that reason, the facility was no longer used as a firearms training facility after 1995 under the terms of ORS 197.770(2) and, accordingly, the facility lost the protection of that statute. Citizens asserted to the hearings officer that, therefore, all of the post-1975 modifications must be evaluated under LC 16.211(3)(c-c). In Citizens' view, the modifications could not be approved because the facility as a whole significantly conflicts with forestry and other uses on adjacent lands.

The county hearings officer agreed with the League that the facility was in existence on September 9, 1995, and,

consequently, could continue to operate until such time as it was no longer used as a firearms training facility. The hearings officer concluded that the intent and the capability to provide training and certifications were sufficient indications of the use of the facility as a firearms training facility. Because of his view that the facility was in existence on September 9, 1995, the hearings officer held that only modifications or improvements made after September 9, 1995, were subject to the "significantly conflict" standard of LC 16.211(3)(c-c). The hearings officer affirmed the planning director's decision but did note that, if the facility as a whole were subject to the "significantly conflict" standard, it would not comply with the code because there was evidence of significant impacts by the facility as a whole on neighboring forestry operations and other uses.

Citizens appealed the county's decision to LUBA. Before LUBA, Citizens asserted that, under ORS 197.770, the fact that the facility *existed* on September 9, 1995, is not enough for it to be entitled to the protection of the statute. Citizens argued before LUBA that the statute only authorizes the continued use of and improvements to a firearms training facility that *lawfully existed* on September 9, 1995. In other words, the uses and improvements must have been "authorized" and "lawful" under the regulations that existed when the improvements were first constructed and the particular use began in order for a facility to be considered to be *in existence* on September 9, 1995. Citizens argued that, because modifications made to the League facility between 1975—that is, the year that the conditional use permit was issued—and 1995 were not authorized and were unlawful, ORS 197.770 may not be used to "grandfather" the League facility. The county, on the other hand, asserted before LUBA that the statute provides protection for all uses and improvements associated with a firearms training facility in existence on September 9, 1995, regardless of whether the uses were authorized or lawful.

LUBA agreed with Citizens, concluding that "it seems unlikely that the legislature intended to protect unauthorized or unlawful facilities, or the entirety of facilities with unauthorized and unlawful expansions." *Citizens for Responsibility v. Lane County*, 51 Or LUBA 588, 598

(2006). LUBA explained that "[t]he statute protects only lawful uses (including lawful nonconforming uses), and does not protect unauthorized uses that required the county's discretionary approval but did not receive such approval." *Id.* at 599. Accordingly, LUBA remanded the county's decision for further proceedings consistent with its reading of ORS 197.770. As we will explain in more detail, LUBA also concluded that, under its interpretation of the statute, the property was no longer being used as a firearms training facility.

On review in this court, the county first assigns error to LUBA's holding that the statute protects only lawful or authorized uses in existence on September 9, 1995. The county argues to this court that the statute protects any firearms training facility in existence on September 9, 1995, that meets the statutory criteria for a firearms training facility regardless of whether the particular use was authorized or lawful. The county argues that LUBA's interpretation of ORS 197.770 is inconsistent with the text of the statute and requires the addition of language that does not appear in the statute, an act inconsistent with rules of statutory interpretation set out in ORS 174.010 and articulated in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993).[3]

■ We agree with the county's understanding of the text of the statute. There is no language in ORS 197.770 that provides that the statute is intended to permit the continuation of only those firearm training facilities established in conformity with whatever regulations existed prior to the effective date of the statute. Indeed, the statute says only that *"[a]ny* firearms training facility *in existence* on September 9, 1995, shall be allowed to continue operating until" it is no longer used. (Emphasis added.) Were the legislature to have intended to limit the statutory authorization as Citizens asserts and LUBA opined, the legislature easily could have added such limiting language. ORS 92.017 exemplifies such

---

[3] In view of our holding, it is unnecessary to address the county's argument that LUBA erred in remanding the county decision for a determination of what authorized or lawful uses existed on September 9, 1995, while at the same time making findings relating to that determination.

language. That statute provides that "[a] lot or parcel lawfully created shall remain a discrete lot or parcel, unless the lot or parcel lines are vacated or the lot or parcel is further divided, as provided by law." Another example is found in ORS 215.705, which controls the construction of dwellings on lots of record within farm and forest use zones. *See also Yamhill County v. Ludwick*, 294 Or 778, 790, 663 P2d 398 (1983) (unauthorized subdivision tracts not "existing legal lots of record" as that term is used in county ordinance).

The county's understanding of the statutory language is also consistent with the apparent purpose of the statute, namely, to permit the continuation of firearms training facilities that meet the statutory definition of such a facility set out in ORS 197.770. We conclude that the county's reading of the statute is consistent with the text and apparent purpose of the statute. *See PGE*, 317 Or at 610-11.

The county also assigns error to LUBA's holding regarding the county's understanding and application of the statutory provision that allows the continued use of a firearms training facility in existence on September 9, 1995, until such time as it is "no longer used as a firearms training facility." LUBA agreed with Citizens that the county hearings officer erred in his interpretation of the statutory provision that the firearms training facility may continue to operate until it is "no longer used as a firearms training facility." Citizens asserted to LUBA that, in order to determine if a firearms training facility is "no longer used," the *actual* use of the facility must be considered. In explaining its decision, LUBA acknowledged that the statute requires "a significant degree of interpretation and reasoning by analogy, given that the text and context of the statute say nothing about how to determine when a qualifying facility is 'no longer used as a firearms training facility.' " *Citizens for Responsibility*, 51 Or LUBA at 594. It reasoned, however, that ORS 197.770 treats firearms training facilities as something like nonconforming uses. LUBA explained:

> "In other words, like nonconforming uses, a 'firearms training facility' may lose its qualifying status through disuse or discontinuation of qualifying activities. *See* ORS 215.130(7)(a). Significantly, the statutory language focuses

on how the facility is 'used,' not on the intent of the property owner or whether the facility continues to be capable of qualifying uses. We agree with petitioners, therefore, that a determination whether a qualifying firearms training facility has lost the protection of ORS 197.770 requires evaluation of the actual use of the facility following September 9, 1995, and whether it continues to qualify as a firearms training facility. If the facility is 'no longer used as a firearms training facility,' the mere intent and capability to use it as a qualifying facility are insufficient to prevent loss of the statute's protection.

"As the hearings officer noted, ORS 197.770 does not specify how long qualifying uses at a facility may be discontinued before losing the protection of the statute. The hearings officer apparently viewed the statute as allowing indefinite discontinuation of actual use as a firearms training facility, as long as there remains an intent and capacity to use it as a training facility. We reject that view. As explained, the statute clearly contemplates that a qualifying facility will be disqualified when it is 'no longer used as a firearms training facility.' While the statute does not specify what period of disuse disqualifies a facility, in this respect the statute is again similar to the statutes governing non-conforming uses at ORS 215.130, which do not specify the length of the period of interruption that will terminate the right to continue a non-conforming use. Instead, ORS 215.130(10)(b) leaves it up to individual counties to establish criteria to determine when a use has been interrupted or abandoned. We note that the county has adopted regulations providing that nonconforming uses are deemed interrupted or abandoned if discontinued for more than one year. LC 16.251(1)(c). Absent some other basis to apply a different period of time, we conclude that whether a qualifying facility in the county is 'no longer used as a firearms training facility' for purposes of ORS 197.770 depends on whether qualifying use of the facility has continued since 1995 with no interruption longer than one year."

*Id.* at 594-95 (emphasis omitted).

LUBA added that the county erred in relying on evidence that the facility had been used for training by several organizations not listed among the types set out in ORS 197.770(2). LUBA also agreed with Citizens that evidence of

such use does not support a finding that the facility continues to be used as a firearms training facility.

■ On appeal, the county argues that LUBA erred in concluding that the property was "no longer used as a firearms training facility" under the terms of the statute. We agree with the county that LUBA erred in its understanding of ORS 197.770. First, we do not find any support in the statute for a requirement that the firearms training facility provide certificates in a particular number or within a particular time frame in order to continue to qualify as a firearms training facility. The certificate issuance provision in the statute is part of the definition of a "firearms training facility," ORS 197.770(2), and not a mandate for a particular level of facility performance. The county understood that the statutory definition was satisfied if the operator of the facility intended to provide training and issue certificates and retained the ability to do so. We believe that that understanding is consistent with the text of the statute. As long as the facility is functioning and *able* to conduct training and issue certificates, we believe that the statutory definition is satisfied.[4]

■ Our second disagreement with LUBA's treatment of the continuation of operation issue is its importation of the one-year abandonment of use provision from the nonconforming use provisions in the county's zoning ordinance. Notably, the county did not treat the statutory authorization for a particular kind of firearm training facility as analogous to a locally declared nonconforming use. The county did not apply any of its nonconforming use regulations. Because the legislative grant required the continuation of the statutorily described uses, the local planning jurisdiction was required to permit them; thus, the legislature took the described uses

---

[4] The hearings officer's decision included a finding that

"[t]he Eugene Practical [S]hooters Association, which is affiliated with the United States Practical Shooting Association (USPSA), has continuously held monthly target matches at the range from the mid-1980s through at least 1995. The testimony of Oscar Thomsen, Mr. Sam Pitts, Mr. Carl McGlothin, and Mr. Monty Millican establishes that firearms training and certifications occurred through 1996 and that firearms training continued after that date at the applicant's facility."

out of the traditional definition of "nonconforming use."[5] ORS 197.770 does have some similarities to a nonconforming use provision. A "firearms training facility" is not listed as a permitted or conditional use in exclusive farm use zones under ORS 215.213 and ORS 215.283, and an existing facility in such a zone (or other restrictive zone) may be regarded as a nonconforming use. Also, the statute includes a means to end the protected use, providing certain conditions are met. Nonetheless, the statute does not import the specific abandonment or disuse provisions from the other statutory nonconforming use provision found in ORS 215.130, and nothing in the statute requires local governments to treat the allowed firearms training use as a nonconforming use. The authorization in ORS 197.770 to continue a use coming within the definition of a firearms training facility does leave the specifics of implementation to the local government.

■    In this case, the county did not apply its nonconforming use provisions as an implementing tool. We conclude that LUBA erred in doing so. Consequently, LUBA erred in establishing a hard time line of nonuse to show an end to the statutorily protected activities. As discussed above, the hearings officer used a "reasonable person" standard, which we find to be consistent with the statute. The hearings officer explained the standard that he used as follows:

> "I believe that several factors are paramount in a determination of whether a facility is no longer used as a firearms training facility. Primary among these factors are intent to utilize a facility for firearms training, whether the facility has retained the ability to serve in that capacity and, o[f]

---

[5] In *Bergford v. Clack. Co./Trans. Serv.*, 15 Or App 362, 367, 515 P2d 1345 (1973), we articulated a definition of "nonconforming use":

> "Furthermore, a nonconforming use is, by its very nature, a use which has been determined to be contrary to the zoning plan, and one which is allowed only because to eliminate it forthwith upon adoption of a zoning plan would constitute a taking without compensation. It follows that a zoning plan, by its very existence, forbids the expansion of a nonconforming use—absent a finding by the appropriate authorities that given the choice of continuing an existing nonconforming use 'as is' or allowing a proposed expansion with attendant changes in the nature of the structure, the changes will result in a situation in which the nonconforming use will be more compatible with the goals of the zoning plan than the existing nonconforming use."

(Footnotes omitted.)

course, whether the facility has actually served in that capacity."

As to the first factor, the hearings officer found that the League had approved the range for hunter education courses and for use by the U.S. Marine Corps Reserve, the Emerald Empire Gun Club, and the Oregon State Defense Force.[6] Also, he noted that the record demonstrated there are several League members who have taught courses and awarded certificates and wish to do so in the future at the facility. With regard to the second factor, the hearings officer found that the League maintained and enhanced its ranges since 1995, and that they can be and are used for training and shooter education "to this day." Finally, he found that there was ample evidence that the facility had been used for firearms training during the last eight years, but there was no evidence to support a finding that certificates issued during the last several years. The hearings officer determined that a reasonable person would not conclude the facility no longer qualified as a firearms training facility merely because "training certificates have not been issued for a couple of years."

Citizens and LUBA identify nothing inherently wrong in using a "reasonable person" standard under the apparently very broad delegation to local planning jurisdictions that is evident in ORS 19.770, and we find that the standard is consistent with the statutory scheme. The hearings officer's decision provided an explanation of how he applied this standard given the facts before him. Given the lack of standards in the statute, we conclude that nothing more was required in support of the decision to grant the requested permit, assuming the facts stated are supported by substantial evidence. The county identified the standard, applied the available facts, and explained its decision.

Admittedly, the use of a reasonable person standard does not provide much general guidance about what the county believes would support a conclusion that a facility was no longer used as described in the statute and about the

---

[6] Of those, only the Gun Club appears to come within the language of ORS 197.770(2).

required duration of nonuse that would support denial of a request to reestablish the use. Although it would be helpful for the county to provide such guidance and, for that matter, it would be helpful for the statute to provide more definite guidance, we cannot say that articulating a standard that will provide the answer as to how each case that might come before it would be decided is necessary for the county's decision to be upheld in this case.

As LUBA itself recognized, ORS 197.770 calls upon the county to exercise "a significant degree of interpretation and reasoning by analogy, given that the text and context of the statute say nothing about how to determine when a qualifying facility is 'no longer used as a firearms training facility.'" *Citizens for Responsibility*, 51 Or LUBA at 594. We agree, but we also conclude that the county did so with respect to the particular application before it by explaining both its interpretation and how the facts before it fit within the interpretation.

Reversed and remanded.